OPINION OF THE COURT
Richard W. Wallach, J.
Defendant Mason has moved to dismiss an indictment charging him with three separate sales of a controlled substance alleged to have occurred on April 28, 1975 and another offer to sell on June 17, 1975. Insofar as his motion sought dismissal "in the interest of justice” (CPL 210.40), a fact-finding hearing was directed by Mr. Justice Dontzin in his order dated September 12, 1978 (People v Clayton, 41 AD2d 204).
The facts developed at the hearing demonstrated that (1) Mason’s constitutional rights have been so seriously violated as to require dismissal of this indictment as a matter of law; and (2) in any event, the interests of justice mandate the same result.
I. INTERFERENCE WITH DEFENDANT’S RIGHT TO THE ASSISTANCE OF COUNSEL FOR HIS DEFENSE.
The foregoing command of the Sixth Amendment has application in State felony prosecutions not only on the trial of the action (Gideon v Wainwright, 372 US 335). Long before Gideon, the United States Supreme Court referred to "perhaps the most critical period of the proceedings” in a criminal case brought against several defendants as "from the time of their arraingment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation” are vital (Powell v Alabama, 287 US 45, 57). The court went on to say that a defendant is as much entitled to the aid of counsel at that time as "at the trial itself.” This enlarged standard is now inviolable (Massiah v United States, 377 US 201; United States v Wade, 388 US 218). The conduct of the two separate special prosecutorial agencies involved here — the special narcotics prosecutor and the special anticorruption prosecutor— *708 has operated utterly to neutralize defendant’s right to independent counsel to assist him in his defense of this indictment.
Shortly after defendant’s arrest on August 28, 1975, he was taken by the arresting officers to Drug Enforcement Administration Headquarters where two police interrogations took place. A Federal agent invited defendant to become an informer against high-level traffickers; when it became evident that defendant could provide nothing of value on this level, the Federal officer departed. Thereupon two city detectives, Kenneth Robinson and Raymond Vallely, told Mason that his only way of avoiding jail was to become a street informer and in that manner to implicate others, and that so long as he engaged in such activity he could remain at liberty. While this form of servitude has been attacked as a form of illegal peonage in the legal literature (Robert L. Misner, John H. Clough, Arrestees as Informants: A Thirteenth Amendment Analysis, 29 Stan L Rev 713), it is unnecessary to reach that question in view of subsequent developments.
The evening discussion closed with Mason stating he would "think over” the detectives’ offer. The next day when Mason was in the detention pens awaiting arraignment, the detectives told him that they were arranging low bail for his immediate release in return for his "co-operation,” because in their view "there was nothing to think about.” At arraignment Mason met his legal aid lawyer assigned by the court, Peter Davis, Esq. After arraignment and prospective release on bail, the two detectives told Mason they would be expecting his call, and he should not "think too long.”
Mason’s persistent reluctance to become a drug informer had been expressed at the evening interrogation as well as in the morning at arraignment. However, the police inquiry had produced one intriguing item: Mason said he had known two violent drug offenders and that during the pending prosecution of one of them he had participated in passing $2,500 to someone at 100 Centre Street to "fix” the case. Mason named the chief architect of the fix as one Louie Eder, now deceased, and Mason indicated a willingness to inform on Eder or anyone else in the criminal justice system to whom Eder might lead. Quite properly, this information was passed along through channels to the anticorruption (AC) prosecutor’s office.
On September 23, 1975, Mason’s case was calendared for *709 a hearing at the Criminal Court (Berman, J., presiding). The minutes of the hearing reveal an immediate complaint by Davis, Mason’s legal aid counsel, to the effect that the police were persisting in talking to his client in counsel’s absence and over his objection. The court promptly instructed the police and ordered that "defendants should not be spoken to by any party, including the District Attorney or any member of law enforcement without the consent of counsel; that is a basic rule and I expect that could be observed. ”
What required the court’s direction was a confrontation between Mason and the two detectives in the hall before the case was called, during which they introduced defendant to Ray Booth, an AC investigator, to pursue the "fix” information. However, this was still a subordinate concern to the narcotics agents. Detective Vallely told Mason that if he knew what was good for him he would start working for them on drug cases. Vallely added: "You’ve got a nice looking wife, she won’t be around when you get back and your kid won’t know you.” At this point, attorney Davis’ protests ended the conversation, and resulted in his complaint to the bench.
Beyond all this, Judge Berman’s order to the police was thereupon blatantly disregarded in a manner that can only be described as contumacious. After the hearing, Vallely again approached defendant in the absence of his counsel and stated, in substance, that Davis was young, inexperienced, and clearly no match for the lawyers who would prosecute Mason. Vallely, although obviously under the prosecutor’s control, never took the stand at the hearing to contradict this evidence.
The gravity of this misconduct by the police cannot be overlooked. As court-appointed counsel, Davis was the court’s own officer in more than the usual sense. Furthermore, court-appointed counsel often labors under difficulties in winning the confidence of his client not faced by privately selected attorneys. Vallely’s misconduct struck at the integrity of the adversary system and the court itself.
At this juncture, Mason’s confidence in the ability of his counsel to defend him was understandably impaired, and over Davis’ objection he went to work as an informer for the AC prosecutor. Under the direction of the AC bureau chief, Richard Nachman, Mason went to work as an informer. Nachman testified that Mason worked for his office for over 10 months in the following way. Wearing a concealed body-wire recorder, *710 Mason would talk to Eder about fixing his case. Eder in turn steered Mason to an attorney who is identified here as Lawyer "X”, since this court is advised that the latter is the subject of a grievance proceeding arising out of this same matter.
The interviews between Mason and Lawyer X were recorded in the hope that they would lead to some evidence of corruption. This aspect of the effort was inconclusive, at one point Lawyer X stating to Mason that with respect to fixing Judges, "the world doesn’t work that way anymore * * *. Forget about it.” The gist of Lawyer X’s advice to Mason was to raise $10,000 for his fee, and to "establish an alibi.” Whether this meant that Mason should gather evidence of a genuine alibi, or should go about fabricating one, is not for this forum to determine.
Nachman testified that Mason’s efforts were devoted, sincere, and promising, but that they were frustrated by the untimely death of Eder whom they hoped to take before the Grand Jury. In return for Mason’s efforts, made in Nachman’s estimation at considerable risk, Nachman promised to urge lenient consideration to both the special narcotics prosecutor and the court.
What is of central importance now is that on October 20, 1975, Lawyer X was substituted as Mason’s counsel in the pending prosecution, and remained so until April 5, 1976. Obviously during this period Mason was without any kind of representation worthy of the name in defending his own case. The prosecution had effectively stultified his first and only genuine defender. His second was not his counsel but his target whose body Mason was hoping to substitute for his own. In a setting such as this, the traditional confidential relationship between lawyer and client had been totally destroyed. No activity by legal aid counsel after his re-entry into the case could possibly restore what had been lost.
Happily, no similar instance of prosecutorial interference with defendant’s right to counsel has been found in the New York cases. However, the problem has not escaped the attention of our sister States. In Commonwealth v Manning (— Mass —; 367 NE2d 635), the Supreme Judicial Court of Massachusetts dismissed a drug prosecution where an overzealous Federal agent telephoned defendant to solicit his co-operation with Federal agents in an ongoing investigation. In the course of the conversation, the agent made "several disparag *711 ing remarks” about the manner in which Manning’s counsel was conducting the defense in the case and predicted that defendant would end up in jail. Two lower courts held that a new trial was the appropriate remedy inasmuch as no actual prejudice had been shown from the single odious phone call. The Supreme Judicial Court went further and dismissed the indictment on the following reasoning: "We are confronted in this case not with the proverbial constable’s blunder or even with good faith overzealousness in the pursuit of legitimate law enforcement aims. Rather, we have here a deliberate and intentional attack by government agents on the relationship between Manning and his counsel in a calculated attempt to coerce the defendant into abandoning his defense. While a balancing test may be appropriate in determining the proper scope of judicially created exclusionary rules [citations omitted], we do not think it the proper course in the circumstances of this case.” (Commonwealth v Manning, supra, p —; 367 NE2d 635, 638.)
Likewise, in People v Moore (57 Cal App 3d 437, 442), the court held that prosecutorial interference with the attorney-client relationship required dismissal of the indictment. The court observed: "Here the People actively interfered with an attorney-client relationship established to defend Moore against the charges for which he had been jailed. Resort to a rule of evidence cannot reasonably remedy violations of Moore’s right to counsel which go to the very conduct of his defense. It is not evidence which has been tainted, rather, it is Moore’s right to due process.”
The foregoing results are entirely consistent with the public policy of this State. Our highest court has prohibited any police interrogation of a defendant in custody after he has retained a lawyer and has held that any waiver by the defendant of his right to counsel is ineffective unless that waiver is delivered in the presence of counsel (People v Hobson, 39 NY2d 479; People v Arthur, 22 NY2d 325). Here, too, any supposed "waiver” by Mason of his right to counsel was solicited in the absence of his lawyer, and, as the court pointed out in People v Hobson (supra, pp 484-485), since this conduct "would constitute a breach of professional ethics * * * in the least-consequential civil matter * * * it would be grossly incongruous for the courts to blink its violation in a criminal matter.” Thus, this court cannot and will not "blink” at the violations of defendant’s rights which were proved at *712 this hearing, and this incongruous prosecution must now be terminated.
In an effort to rebut the foregoing, the People have argued that the constitutional point has been foreclosed by prior rulings on defendant’s previous motions and that the only consideration left to this court is dismissal in the interest of justice. This argument appears to rest on an application of the doctrine of "law of the case”. This doctrine does not preclude present consideration at this time of prosecutorial interference with defendant’s right to counsel. The only specific consideration of this aspect of the case has been a prior decision of Mr. Justice Dontzin dated January 10, 1978 in which he held that defendant was not entitled to additional discovery and inspection and other pretrial relief solely on a showing that Lawyer X was the proponent of a pretrial omnibus motion before another Justice of this court. Whether the quality of this pretrial motion measured up to acceptable legal standards is not the test of whether defendant’s constitutional right to wholly independent counsel has been impaired.
Even if this decision and a subsequent decision on reargument denying any further relief to defendant other than the instant Clayton hearing could be regarded as involving Mason’s constitutional right to counsel, the decision of a coordinate Judge made on motion papers cannot preclude a contrary finding made after the kind of plenary hearing that occurred here. The proof at a hearing, resulting in an entirely fresh record, eliminates any prior contradictory determination made solely upon a lawyer’s affirmation resting entirely upon information and belief (see Cohen v New York Herald Tribune, 63 Misc 2d 87, 103). Furthermore, the doctrine of "law of the case” is an extremely flexible one (Fried v Lakeland Hide & Leather Co., 14 Misc 2d 305) and relates only to "the practice of courts generally to refuse to reopen what has been decided, not a limit of their power.” (Messinger v Anderson, 225 US 436, 444.) Obviously, the doctrine is a sensitive instrument addressed chiefly to judicial efficiency against which a constitutional right surely cannot founder. Furthermore, no court, even one of appellate jurisdiction, has "discretion” to withhold a constitutional right (Baltimore Mail S. S. Co. v Fawcett, 269 NY 379, cert den 298 US 675).
The prosecutorial misconduct here far exceeded the single phone call found intolerable by Massachusetts in Manning and equaled the misconduct found unacceptable by California *713 in Moore. Long ago Lord Mansfield rejected the argument that the air of England was not “too pure for a slave to breathe in” (Somerset v Stewart, 98 Eng Rep 499, 506 [1772]). At that very same time the Magistrate in Kingston, Jamaica, whose courthouse flew the same flag, was left free to take a different view of his own locus in quo. Since then, too much has gone on to permit this court to suppose that the constitutional air of New York may be less pure than that of Massachusetts or California. The indictment must, therefore, be dismissed.
II. DISMISSAL IN THE INTEREST OF JUSTICE.
Wholly apart from the unwarranted prosecutorial intrusion upon defendant’s right to counsel, which would invite discretionary dismissal as well as a matter of law, there are ample additional reasons as to why the further prosecution of this indictment is not in the interest of justice.
Over three years have elapsed from the date of indictment. During that time, defendant was recruited into continuous and regular activity as an undercover informer at the beck and call of the AC prosecutor. Defendant became a resident of a southern State, and was obliged to make frequent trips to New York to discharge this responsibility. The dangerous character of his informer work took its toll not only upon defendant but upon his family relationships. His unexplained absences were in part responsible for the destruction of his marriage and family life.
Furthermore, defendant became the victim of a cruel illusion. He was told by the AC prosecutor that his co-operation would be called to the attention of the special narcotics prosecutor and the court in mitigation of his punishment. Yet all the while both prosecutors’ offices knew of the draconian provisions of section 65.00 (subd 1, par [b]) of the Penal Law which permit probation after conviction only if the informer’s activity leads to convictions of A-grade drug offenses.
Thus, one arm of the State was holding out a roseate prospect that defendant’s part in dangerous labor would confer a benefit on him, yet another arm of the State, in whom the final decision lay, knew that this promise could only be a cruel sham. This court takes judicial notice that the offer now made to defendant of a plea of guilty, together with a mandatory jail sentence of one year with lifetime probation, is no *714 more than any ordinary first offender would receive without any "co-operation” whatsoever.
In Matter of Chaipis v State Liq. Auth. (44 NY2d 57) a tavern owner was indicted upon the charge of promoting prostitution as a felony. Defendant pleaded guilty on a negotiated plea to one count of permitting prostitution, a misdemeanor, upon the representation by the prosecutor that if he co-operated with the police and the special prosecutor into allegations of official corruption, that co-operation "would be brought to the attention of the New York State Liquor Authority with a view towards preserving his liquor license.”
As in this case, Chaipis’ co-operation was considerable and not without danger to him. Nonetheless, when Chaipis’ liquor license came up for renewal, the State Liquor Authority, although "advised” of Chaipis’ co-operation, revoked his license. The Court of Appeals held that Chaipis was misled by the prosecutor’s promise into believing that his license would be preserved and that "the authority may not, by self-imposed blinders, ignore its responsibility as an arm of the State, but only one among many.” (Matter of Chaipis v State Liq. Auth., supra, p 66.)
Although the authority maintained its firm position upon remand, in a subsequent article 78 proceeding addressed to the Supreme Court, the revocation penalty was held to be "shocking to one’s sense of fairness” (Matter of Pell v Board of Educ., 34 NY2d 222, 233) and Special Term reduced the penalty to a 30-day suspension and a bond forfeiture of $1,000. (Matter of Chaipis v State Liq. Auth., NYU, Oct. 10, 1978, p 29, col 2.)
To permit this prosecution to go forward against the representations made to this defendant would be shocking to this court’s sense of fairness. The only remedy, dismissal in the interest of justice, is, therefore, indicated.
Furthermore, there has been overwhelming proof as to the extraordinary strides that defendant has taken toward total rehabilitation of himself as a valuable and contributing citizen of the community. After a series of difficult and degrading employments, he has now obtained a job at a leading university as a supervisor of an animal facility devoted to veterinary science. He has acquired attested skills in animal surgery and as a laboratory technologist with the responsibilities for teaching others. There is a present possibility that he may be employed at an even more responsible scientific job. This *715 extraordinary achievement, against what many would view as hopeless odds, would be utterly destroyed by the imposition of a jail sentence at this time.
Defendant’s vocational accomplishments must also be evaluated in terms of his origins. Born in Harlem on July 18, 1946, his father left home at an early age. Because he could not get along with one of his mother’s male companions, Mason was left on the streets at age 15 when his mother became irked at the refusal of the Family Court to assume custody of him. Thus, friendless and alone at an early age, he managed to begin a career at the Hospital for Joint Diseases preparing animals for surgery, and, through remarkable efforts, slowly learned the skills of a technician in animal surgery. When laid alongside this life story, defendant’s minor brushes with the law and modest exaggerations as to his formal education pale into insignificance.
Whether measured against any of the considerations set forth in People v Clayton (41 AD2d 204, supra) or the goals of rational sentencing, the jailing of this defendant at this time would be an affront to public justice.
For the foregoing reasons, this indictment is now dismissed and bail, if any, is exonerated.