OPINION OF THE COURT
Joseph Slavin, J.
Defendant, an acquittee of the crime of murder by reason of mental disease or defect, petitions this court for a rehearing after a denial by Mr. Justice Rigler of a dual application (writ of habeas corpus by defendant for his discharge and petition by the Commissioner of Mental Hygiene for release of defendant on conditions) deemed by the court one application by the commissioner pursuant to CPL 330.20 (subd 12). Both applications were made prior to the amendment of CPL 330.20, but as consolidated were tried by Mr. Justice Rigler under the statute as amended, effective September 1, 1980 (L 1980, ch 548, § 11).
Defendant’s request for a rehearing contains the demand that it be held before a jury and that the court appoint two qualified psychiatrists to examine him, make their report in writing and, if necessary, be required to testify.
To expedite this proceeding, the court entered an interim order granting petitioner’s petition for a rehearing, appointed two psychiatrists to examine the petitioner and stated that a memorandum decision will follow.
*961 The District Attorney opposed the grant of a rehearing contending:
(1) “It is not a violation of equal protection” to deny a rehearing on a release application by the commissioner;
(2) If a rehearing should be granted, “its scope should be limited to that evidence presented at the first hearing”;
(3) The prior decision of Mr. Justice Rigler is the law of the case and is binding on this court;
(4) “The proper standard of proof upon the rehearing is ‘fair preponderance’ ”.
Contentions (5) and (6) will not be discussed as there is no real dispute with respect thereto. The hearing shall be held as a civil proceeding with a jury of six impaneled and a unanimous verdict will not be required.
This proceeding being the first of its nature under the statute as amended (CPL 330.20), the court, in charting its course through the shoals of divergent and differing opinions rendered in our courts of appellate and co-ordinate jurisdiction, and in the Federal courts, will consider each of the contested objections of the District Attorney.
The rights of the mentally afflicted, as conceived by our courts and as directed to those acquitted of heinous crimes, are most difficult of definition without a visual portrayal of the reported subhuman conditions that impelled our courts to decry basic denial of human decency and of elemental constitutional rights to those hidden from public view and confined to guarded “hospitals” for the insane.
Daniel M’Naghten, tried and acquitted of murder by reason of insanity, languished in a mental hospital for 22 years without the benefit of any further proceedings until he died. No court was ever called upon to determine whether his mental illness continued to the date of his death. Perhaps his case may be excused since it occurred during the years from 1843 to 1865 when the British were preoccupied with other matters affecting that nation. However, in the ensuing years such incidents did not go unnoticed or uncorrected.
A century later, in 1970, in United States ex rel. von Wolfersdorf v Johnston (317 F Supp 66, 67) the relator *962 initially was determined “insane” and “unable to stand trial” and had been confined for almost 20 years in a “more miserable” hospital, Matteawan State Hospital together with the “criminally insane” and other “dangerous” persons. “After seeking for many years” to be transferred, he applied for a writ of habeas corpus so that he might spend his last days, while awaiting death, in a more peaceful environment. Though now 86 years of age and concededly suitable “in all medical respects for civil commitment * * * [nevertheless he] is locked away in a place more likely to drive men mad than to cure the ‘insane’ ” (p 66). The court held such incarceration to have violated his protection against cruel and unusual punishment.
Similarly, in People v Metesky (71 Misc 2d 519) the defendant was held in the same Matteawan State Hospital for 15 years. The court, to grant him some measure of proper relief, read into existing statutes, to sustain their constitutionality, the right of defendant to a jury trial on the question of his retention. He was thereafter released.
These shameful pages of legal history, reflecting the insensitivity of the times, should have faded away as relics of abhorrence of misdeeds of bygone eras. But, alas, not so in the year of 1981. In Scott v Plante (641 F2d 117, 128, 129), Scott, an acquittee of the crime of murder, was confined to a maximum security section of the Vroom Building, a “hospital” maintained in the enlightened city of Trenton, New Jersey. The court’s straightforward description of conditions at the hospital reads (p 128) as follows: “There was ample evidence that Scott and the other inmates were exposed for twenty four years to subhuman living conditions, including poor plumbing with leaking pipes covering the floor with inches of water; inoperative sinks and toilets; inadequate ventilation; absence of windows or inoperative windows; inability during seven months of the year to go into the yard for fresh air; inoperative radiators resulting in indoor temperatures below 50°, summer temperatures reading 105° due to absence of ventilating equipment”. These conditions continued even though the hospital staff recommended that Scott be placed in a civil ward because of his co-operative behavior. Little regard and no relief was accorded to him in his *963 various petitions for relief. These conditions continued to and “through [the] trial (and is to date) confined to a prison wing of the hospital which includes sentenced inmates suffering severe mental illnesses” (p 129).
The court, in granting Scott basic relief, referred to the Baxstrom v Herold case (383 US 107) and more particularly to the transfer of 992 patients from Matteawan and to the report of researchers who found that “all but seven of the 992 had fared well enough in less secure, often unlocked facilities *** Indeed, 147 were discharged to the community, far more than would have been released from Matteawan in an average year” (Scott v Plante, supra, p 130, n 12). The court then observed (p 130, n 12) that “it should increase courts’ skepticism both about claims that a person is dangerous and about claims that hospitalization is necessary”.
This court has seemingly digressed from the basic issues here in order to depict the almost “foreordained” continuance of detention of criminal acquittees in secure “hospitals for the insane”, because of the lack of proper statutory and judicial safeguards. Fortunately, safeguards are being increased and refined with each ensuing year.
Philosophically, this court not only adheres to and also agrees with the progressive thinking and holdings of our courts in their most recent decisions and will now consider the objections of the District Attorney within the background portrayal of the conditions to which the “insane” acquittees were subjected.
i. “it is not a violation of equal protection to deny” PETITIONER A REHEARING.
Former CPL 330.20, prior to its amendment, and its predecessors, provided in substance that either the Commissioner of Mental Hygiene may petition, upon noting the progress of the acquittee, for his release (subd 2) or the committed acquittee may make such application (subd 5). In either instance “Any such hearing shall be deemed a civil proceeding” (subd 3). Though former CPL 330.20 did not provide for rehearings, the courts have uniformly granted rehearings after a denial of a release on conditions or of a discharge. On such rehearings, the committed *964 person was entitled to a jury trial (see People v Decker, 42 AD2d 857, app dsmd 34 NY2d 565; People v McCabe, 74 Misc 2d 1060; Matter of Lashway v Hanes, 78 Misc 2d 979, 985). In Lashway, the court approved the reading into statute by the court in People v Metesky (71 Misc 2d 519) a right to a jury trial, and then stated (p 985): “It is inconceivable that the only recourse for an acquitted defendant retained as a civil patient is to continually apply for a nonjury hearing to the very same court which conducted the trial proceedings, the hearing for retention, and subsequent rehearings *** The Criminal Procedure Law does not provide for a jury trial within the provisions of article 330. It is the determination of this court that the petitioner is entitled to a civil jury trial under the provisions of CPL 330.20”.
CPL 330.20, as amended, now provides, as is pertinent, that upon entry of a verdict of not responsible for the crime charged, “the court” must immediately issue an “examination order” (subd 2). An initial hearing is then held to determine defendant’s present mental condition and if the District Attorney establishes to the satisfaction of the court that the defendant has a dangerous mental disorder or is mentally ill, the court “must issue a commitment order” (subd 6).
The petitioner had “been hospitalized in various psychiatric institutions” since 1973 (date of his commission of the homicides). “In July 1976, he was acquitted of these charges by reason of mental disease or defect, and pursuant to law, has been retained in the custody of the Commissioner” (opn of Rigler, J.). Thus, for the purposes of this proceeding and under the statute as amended, the petitioner is deemed to have been found to have a “dangerous mental disorder” and “a commitment order” had been issued authorizing defendant’s confinement and retention at the Kingsborough Psychiatric Center. Petitions by petitioner for his release, made in 1978 and 1979, were denied. The statutory provisions for an “[i]nitial hearing; commitment order” (CPL 330.20, subd 6), that give sanction to petitioner’s present status, will be deemed to have been complied with.
The continuance of retention of defendant and his right to a rehearing is governed by the remaining subdivisions of *965 the statute. (CPL 330.20.) Subdivision 8 provides for the commissioner to obtain a “retention order” (to accord legality to petitioner’s continued retention, such order is deemed by this court to have been obtained). Subdivision 9 provides for “Second and subsequent retention orders.” Subdivision 12, however, provides for a “Release order and order of conditions.” The District Attorney contends that the only proceeding brought and considered by Mr. Justice Rigler was for a release order on conditions. The initiatory proceeding by defendant for a writ of habeas corpus is completely disregarded. The importance of this position by the District Attorney is his reading of CPL 330.20 (subd 16) as not including in the enumeration of categories, under which a right of rehearing may be had, the right to a rehearing from an application by the commissioner for a release. Consequently, it is urged that petitioner’s application must be denied.
Subdivision 16 provides as follows: “Rehearing and review. Any defendant who is in the custody of the commissioner pursuant to [a] a commitment order, [b] a retention order, or [c] a recommitment order, if dissatisfied with such order, may, within thirty days after the making of such order, obtain a rehearing and review of the proceedings and of such order- in accordance with the provisions of section 9.35 or 15.35 of the mental hygiene law” (emphasis added). Overlooked by the District Attorney in his statement that an application for a release order is neither within the categories of a commitment order, retention order or recommitment order, is the ending phrase of subdivision 16, namely, “in accordance with the provisions of section 9.35 or 15.35 of the mental hygiene law.”
Section 9.35 significantly provides that “If a person who has been denied release *** be dissatisified with any such order he may, within thirty days after the making of any such order, obtain a rehearing and a review of the proceedings already had * * * to a justice of the supreme court other than the judge or justice presiding over the court making such order. Such justice shall cause a jury to be summoned and shall try the question of the mental illness and the need for retention of the patient so authorized to be retained.” Section 15.35 of the Mental Hygiene Law is to the same effect.
*966 Thus, the very inclusion in CPL 330.20 (subd 16) of sections 9.35 and 15.35 of the Mental Hygiene Law, impels this court to construe subdivision 16 to accord to a petitioner on the denial of an application for a release order (in effect, the equivalent of a “retention order”) a right of rehearing and a right of a jury trial. Moreover, it is most anomalous to presume that a detainee has no right to commence a proceeding for his discharge and when he does so, a court, by the simple expedient of consolidating his petition with that of a petition for a release, bars him from seeking a rehearing on the court’s determination of continuance of his retention.
II. THE SCOPE OF THE REHEARING “SHOULD BE LIMITED TO THAT EVIDENCE AT THE FIRST HEARING.”
This contention will not be dignified beyond the statement in section 9.35 of the Mental Hygiene Law that where a rehearing is to be held before “a justice of the supreme court other than the judge or justice presiding over the court making such order” that the “[other] judge or justice” has not been empowered to act as appellate court of review. Section 9.35 of the Mental Hygiene Law specifically provides that he shall not so act and commands him to “cause a jury to be summoned and shall try the question of mental illness and the need for retention of the patient”. The jury, by no stretch of the imagination, may be deemed by statute to have been constituted an appellate court of review summoned to review the minutes and determination made on the prior hearing. The whole purpose of the rehearing before another Justice and a jury is that the petitioner shall not be prejudiced by the prior testimony, evidence and decision thereon.
III. DECISION OF MR. JUSTICE RIGLER IS THE “LAW OF THE CASE” “BINDING ON THIS COURT.”
The doctrine of law of the case is not a statutory concept compelling rigid observance. It is a rule of judicial convenience and efficiency applicable only in the same litigation between the same parties on the same facts and evidence. Basically, one Judge should not, during the various stages of the litigation, review or overrule an order ruling and determination of a co-ordinate Judge, irrespective of *967 whether a formal order had been entered. However, the doctrine is flexible, sensitive, without the finality of the doctrine of res judicata, and does not limit the power of a Judge to deviate from a decision made by another (see Messenger v Anderson, 225 US 436, 444; Werthner v Olenin, 186 Misc 829, 831, affd 272 App Div 798; People v Mason, 97 Misc 2d 706, 712; Matter of Silverberg v Dillon, 73 AD2d 838, 839; Matter of McGrath v Gold, 36 NY2d 406, 413; People v Leone, 44 NY2d 315, 321).
Initially, this court does not consider the decision of Mr. Justice Rigler as an interim order or decision made a stage of the proceeding for release of petitioner from a secure hospital for the mentally ill, but a final determination on the evidence presented at the hearing over which he presided. Subsequent hearings for release or discharge are new proceedings based upon new evidence. A rehearing before this court and a jury is a proceeding that will encompass reports, testimony and evidence of psychiatrists appointed by the court for this rehearing. The court and the jury, as earlier observed, are not acting in the role of appellate reviewers of the record made before Mr. Justice Rigler, but solely as triers of the facts on the evidence presented to them. This evidence will not be the same because of the two psychiatrists appointed by the court, who must make their report and may be called upon to testify.
Moreover, the ruling that the burden of proof required should be the preponderance of evidence is not a ruling on specific issues, but solely a ruling on the weight to be given to the evidence presented on the issues before Mr. Justice Rigler. Dorsey v Solomon (604 F2d 271, 276-277) best expresses this court’s view, stating as follows: “The district court ruled that the standard of proof appropriate in commitment hearings was proof by a preponderance of evidence * * * [although no appeal was taken from the district court’s ruling, the court may reconsider on remand the question of the proper standard of proof.”
iv. “the proper standard of proof upon a rehearing is ‘fair preponderance’ ”,
Since Baxstrom v Herold (383 US 107, 111, 112, supra) there has been a plethora of decisions defining, elaborating *968 upon, and even limiting its holding to specific circumstances of a case. The rationale and progressive thinking of Mr. Chief Justice Warren is encapsulated in his renouncement of differentiation of rights between the civilly insane from the “criminally insane” (those with dangerous or criminal propensities), stating (p 111) “Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill at all” This declaration has been channeled, defused and weakened by subsequent decisions, but this court will chart its own course within the direction of his beacon light and will focus and expand upon his statement “For purposes of granting judicial review before a jury of the question whether a person is mentally ill and in need of institutionalization, there is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments” (pp 111-112).
Indulging in selectivity for purposes of brevity, consider the justification of a difference in treatment as expressed by the court in Warren v Harvey (632 F2d 925, 931): “the obvious difference between insanity acquittees and other persons facing commitment is the fact that the former have been found, beyond a reasonable doubt, to have committed a criminal act. Insanity acquittees thus have ‘proved’ themselves a danger to society at one time. Nonacquittees, in contrast, have not been found by any factfinder to have harmed society as a result of their mental illness. This difference, we believe, gives rise to considerations which justify a lesser standard of proof to commit insanity acquit-tees than to commit other persons *** Ordinarily, if a person is wrongfully committed to a mental institution, he may suffer great harm at the hands of society * * * The cost of an erroneous decision to commit a person *** is great indeed *** Therefore, by imposing a more stringent burden of proof, society has sought to ‘impress the factfinder with the importance of the decision’, and thus reduce the chance that a harmless individual will be *969 confined erroneously to an institution *** The same considerations do not come into play when the person facing commitment is an insanity acquittee. He need not be overly protected *** [W]hile society derives no benefit from erroneously confining ordinary persons who are not in fact mentally ill and dangerous, the erroneous confinement of an insanity acquittee who in fact was not mentally ill at the time of his crime indirectly benefits society by keeping a ‘sane’ criminal off the streets * * * It is hard to view the insanity acquittee with the same solicitude.”
In commenting on Warren v Harvey (472 F Supp 1061), the lower court decision that was affirmed as above, but written in undramatic and formal terms, the court in Benham v Edwards (501 F Supp 1050, 1065) stated preliminarily, “To punish an insanity-acquitee, or to utilize a procedure which includes a punitive component, runs counter to the overwhelming authority that an insanityacquitee is not responsible, and not properly subject to punishment *** ‘Once petitioner was acquitted, even by reason of his insanity, his criminal responsibility for his past acts was at an end.’ *** ‘the individual is confined in the hospital for the purpose of treatment not punishment *** Any preoccupation *** with the need of punishment for crime is out of place in dealing with an individual who has been acquitted of the crime charged’ * * * ‘that one who commits a wrong by reason of insanity must be acquitted is so well-settled that no one questions it’ *** ‘A person confined to an asylum or a hospital for the insane, after his acquittal on the ground of insanity, is not to be considered as a criminal undergoing punishment’ ”. Following the foregoing recitation of quotes from cited authorities (omitted by this court for brevity) the court then stated (p 1067) “This Court is not afflicted with the judicial myopia which seems to have burdened the Court in Warren *** In sum, with respect to the commitment of insanity-acquitees, the State must initiate a commitment hearing at which it must sustain the burden of proving, by clear and convincing evidence, that the insanity-acquitee presently meets the criteria for M.H.C. commitment.”
The Warren v Harvey court bespeaks of a thinking that sheds no tears on M’Naughten’s death after 22 years in a *970 mental hospital, or of permitting von Wolfersdorf to languish with the “criminally insane” and other “dangerous” persons for almost 20 years or of the shrugging of shoulders at Metesky’s continued confinement for 15 years as a “dangerous incapacitated person” and/or of the unbelievable tolerance of the shameful confinement of Scott for approximately 25 years.
The court in Addington v Texas (441 US 418, 432-433) clearly and in unmistakable descriptive language stated that in a civil commitment proceeding, “To meet due process demands, the standard has to inform the factfinder that proof must be greater than the preponderance of the evidence standard applicable to other categories of civil cases”. The standard set was clear and convincing proof. The court recognized the full gravity of incarcerating an individual into a mental institution and the difficulty of release therefrom under the mere standard of preponderance of evidence. There is a natural hesitancy to release or discharge an internee previously committed as “dangerous” where there is some expert testimony of possible risk to society. Thus, the “foreordained” continuance of confinement of those shut away as “dangerous”.
In Vitek v Jones (445 US 480) the court embraced the Baxstrom philosophy and boldly stated that even an imprisoned criminal has a right to demand confinement only within the prison walls and with his activity restricted to a prison cell. The criminal may vigorously object to confinement in a mental institution. His rights to due process and equal protection may not be trampled upon merely because he is a criminal serving a prison sentence. The beauty of Vitek is the perceptiveness of the court, its sensitivity to the rights of an individual and its language of sparkling clarity reflected in its statements (pp 492-493): “Were an ordinary citizen to be subjected involuntarily to these consequences, it is undeniable that protected liberty interests would be unconstitutionally infringed absent compliance with the procedures required by the Due Process Clause. We conclude that a convicted felon also is entitled to the benefit of procedures appropriate in the circumstances before he is found to have a mental disease and transferred to a mental hospital.” Rhetorically, can this *971 court hold that an acquittee is entitled to less- safeguards than a “convicted felon” serving a sentence.
Scott v Plante (641 F2d 117, supra) pries upon the door of the “skeleton closet” of shameful treatment of an acquittee and spotlights the black page in history of treatment of the insane, particularly of those detained and confined under the philosophy of “no great tragedy”, “society may be protected by their being kept off the streets.”
Such is current thinking of our Federal courts. Let us now analyze our most recent New York authorities and CPL 330.20 as amended and under which petitioner is detained.
People v Lally (19 NY2d 27, 35) adopted the rationale of Baxstrom (383 US 107, supra) stating “To comply with the spirit if not the express language of the Baxstrom decision * * * we hold that, before there can be any commitment [of an acquittee] to Matteawan State Hospital for the insane under section 454 procedures, a person must be accorded all the protections of sections 74 and 85 of the Mental Hygiene Law including a jury trial, if requested.” Thus, under Lally, the acquittee is entitled to the same basic rights as appertain to those never charged with or acquitted of a crime.
In Matter of Lublin v Central Islip Psychiatric Center (43 NY2d 341, 344) the court considered the acquittee’s detainment solely on “a narrow purely legal one” divorced from the distinctions between criminal and civil patients, stating “Must a person who has been validly committed as a result of an acquittal by reason of mental defect or disease, and who at a later time seeks release *** be required to prove [beyond] a fair preponderance of the evidence that he may safely be released? We hold that he must.” Thus, the applicable standard of proof is that of the normal civil proceeding, and petitioner need only show by a fair preponderance of the credible evidence that he may be discharged or released without danger to himself and others (p 345). The court in its strictly legal approach considered only the minimal burden of proof to be shouldered by a detainee to obtain his release.
Matter of Torsney (47 NY2d 667) in its own landmark decision, made no reference to Lublin (supra). But in *972 Matter of Estes (75 AD2d 451, 452-453) the court described Torsney in the context oí Lublin as to the standard of proof required stating: “Although the [lower] court did not state the procedural standards it followed in deciding the case, we may reasonably assume that in accordance with the established law at the time it placed the burden of proof upon petitioner to prove by fair preponderance of the evidence that she was no longer a danger to herself or others by reason of mental illness or defect (* * * Matter of Lublin v Central Islip Psychiatric Center * * *). Petitioner correctly contends that subsequent appellate decisions have modified this rule. Specifically, she notes that recently the Court of Appeals, when considering a similar application, stated: ‘equal protection mandates that [one acquitted by reason of mental disease] be afforded the same procedural rights governing [her] release from custody as any other involuntarily committed person’ and further, that ‘in our view, appellants’ [sic] petition for release must be measured by the same substantive standards governing involuntary civil commitment of any other individual’ (Matter of Torsney ***). The procedural rights to be accorded a patient involuntarily committed have now been fixed by the United States Supreme Court. Due process requires that such patients not be involuntarily confined unless those seeking to do so establish the need for confinement by clear and convincing evidence (Addington v Texas *** cf. Matter of Torsney * * *).” (Emphasis added.)
CPL 330.20 was amended subsequent to Lublin (supra) and therefore must now be read and interpreted in context with Torsney (supra) and Estes (supra). The full and proper significance that may be gathered by the Legislature’s insertion in subdivision 16 that the hearing and review of the proceedings shall be “in accordance with * * * section 9.35 or 15.35 of the mental hygiene law” and the Legislature’s addition of subdivision 17, mandating that “a defendant committed to the custody of the commissioner pursuant to this section shall have the rights granted to patients under the mental hygiene law” is that an acquittee shall have the same and no lesser rights than that of a detainee under a civil commitment. Most important, the standard of proof, “clear and convincing”, shall be the same for each *973 (see, also, Matter of New York State Dept. of Mental Hygiene [Lubin], NYLJ, Feb. 13, 1981, p 17, col 6).
The court, in this proceeding for a rehearing, is not bound by Mr. Justice Rigler’s decision nor does this court agree with the learned Justice on the standard of proof required, nor with the opinion stated in Matter of Hurley (104 Misc 2d 582) and People v Plaksin (107 Misc 2d 696) that adhered to his view.
Accordingly, petitioner’s petition for a rehearing and review pursuant to CPL 330.20 (subd 16) is granted. A jury shall be summoned for the hearing and the standard of proof shall be “clear and convincing.”